# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-10857

United States Court of Appeals
Fifth Circuit

**FILED**

January 31, 2017

Lyle W. Cayce
Clerk

RALPH S. JANVEY,

        Plaintiff – Appellee,

v.

JAMES R. ALGUIRE; VICTORIA ANCTIL; TIFFANY ANGELLE; SYLVIA AQUINO; JONATHAN BARRACK; MARK TIDWELL; CHARLES RAWL; SUSANA ANGUIANO; TERAL BENNETT; LORI BENSING; SUSANA CISNEROS; RON CLAYTON, JOHN D. ORCUTT, et al.,

        Defendants – Appellants.

---

CONSOLIDATED WITH 14-10945

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the Stanford International Bank, Limited, et al.,

        Plaintiff – Appellee,

v.

ORESTE TONARELLI,

        Defendant – Appellant.

---

CONSOLIDATED WITH 14-11014

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

RALPH S. JANVEY, in his capacity as Court-Appointed Receiver for the
Stanford International Bank, Limited, et al.,

                    Plaintiff – Appellee,

v.

JUAN ALBERTO RINCON,

                    Defendant – Appellant.

_____

CONSOLIDATED WITH 14-11093

RALPH S. JANVEY, in his capacity as Court Appointed Receiver for the
Stanford International Bank Limited, et al.; OFFICIAL STANFORD
INVESTORS COMMITTEE,

                    Plaintiffs – Appellees,

v.

LUIS GIUSTI,

                    Defendant – Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before HIGGINBOTHAM, OWEN, and ELROD, Circuit Judges.

PER CURIAM:

        This case is the latest in a number of appeals arising from the collapse

of Allen Stanford's massive Ponzi scheme.  Ralph Janvey, the Receiver for the

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

Stanford entities, seeks to use the Texas Uniform Fraudulent Transfer Act to take back money paid to employees of various Stanford entities. The district court denied these employees' motions to compel arbitration based on arbitration agreements included in the terms of contracts with the Stanford Group Company. We AFFIRM.

## I.

R. Allen Stanford created a large network of interconnected companies that sold certificates of deposit to investors through the Stanford International Bank, Ltd. (the "Bank"). These certificates of deposit promised favorable returns and drew over $7 billion in investments in the nearly ten years that the scheme operated. Stanford generated the promised returns not by wisely managing the investors' money but by using payments from new investors to cover the gains paid to older investors—a classic Ponzi scheme. Stanford and his Chief Financial Officer, James Davis, pleaded guilty to a number of federal offenses and are currently incarcerated.

In an effort to unwind the scheme, the Securities and Exchange Commission sued Stanford, the Stanford Group Company (the "Company"), and numerous other Stanford entities. At the SEC's request, the district court appointed Janvey as Receiver and "charged him with preserving corporate resources and recovering corporate assets that had been transferred in fraudulent conveyances." *Janvey v. Brown*, 767 F.3d 430, 433 (5th Cir. 2014).

The Receiver sued a large group of individuals who profited from the Stanford scheme and froze assets in Stanford entity accounts tied to those individuals. The district court severed the Receiver's claims against investor-defendants from the Receiver's claims against employee-defendants. This

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

court has dealt separately with various claims against the investor-defendants and they are not at issue here.[1]

The defendants in the present action all previously worked in various capacities for the Stanford enterprises and received salary, commissions, bonuses, or later-forgiven loans from the Stanford entities.

Shortly after the Receiver initiated his claims against these former employees, they moved to compel arbitration. The motions to compel arbitration relied on arbitration agreements between the Company or Stanford Group Holdings, Inc. (another Stanford entity) and the former employees.[2] The agreements were contained in: (1) promissory notes between the defendants and the Company that governed the upfront loan payments that the Company awarded to the defendants when they joined Stanford; (2) the broker-dealer forms that the Company submitted to the Financial Industry Regulation Authority (FINRA) when registering the employee-defendants as brokers; (3) FINRA's internal rules governing disputes between brokers and their employers; and (4) Stanford Group Holdings, Inc.'s Performance Appreciation Rights plan. The arbitration clauses in the promissory notes provide that: "any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the National Association of

---

[1] A more exhaustive factual background can be found in other cases involving the Stanford Ponzi scheme. *See, e.g.*, *United States v. Stanford*, 805 F.3d 557, 563–65 (5th Cir. 2015), *cert denied*, 137 S. Ct. 491 (2016); *Brown*, 767 F.3d at 432–34; *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 188–89 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 589–91 (5th Cir. 2011); *Janvey v. Adams*, 588 F.3d 831, 833–35 (5th Cir. 2009).

[2] One of the employee-defendants, Luis Giusti, signed an arbitration agreement in which the Bank was the counterparty.

4

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

Securities Dealers (NASD) . . . ."[3]  The other arbitration clauses are materially indistinguishable for purposes of this case.

   While the motions to compel arbitration were pending, the district court issued a preliminary injunction preventing the employees from accessing the frozen assets.  The defendants challenged the injunction in an interlocutory appeal.  We held that: (1) the district court had power to consider the preliminary injunction before deciding the motion to compel arbitration; (2) the district court did not abuse its discretion by issuing the preliminary injunction; (3) the preliminary injunction was neither an attachment nor overly broad; and (4) although the district court had not yet ruled on the motion to compel arbitration, the Receiver's claims were not subject to the arbitration agreement because the Receiver was suing not on behalf of the Stanford entities, but rather on behalf of creditors who were not parties to the arbitration agreements.  *Janvey v. Alguire* (*Alguire I*), 628 F.3d 164, 185 (5th Cir. 2010). We then withdrew that opinion and replaced it with another opinion that repeated the first three holdings but concluded that we lacked jurisdiction over the still-pending motion to compel arbitration and remanded to the district court for consideration of the motion in the first instance.  *Janvey v. Alguire* (*Alguire II*), 647 F.3d 585, 605 (5th Cir. 2011).

   The district court, although not bound by our decision in *Alguire I*, agreed with its reasoning and denied the motions to compel arbitration.  As we had in *Alguire I*, the district court reasoned that the Receiver's claims, brought on behalf of third-party creditors, were not affected by the promissory notes between the defendants and the Company.  *Janvey v. Alguire*, No. 3:09-cv-724, 2011 WL 10893950, at *4 (N.D. Tex. Aug. 26, 2011).

---

[3] Later arbitration agreements required arbitration governed by the rules of FINRA, the successor to NASD.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

While the appeal from that decision was pending, we held in another Stanford scheme appeal that the Receiver represented the creditors, not the Stanford entities. *Janvey v. Democratic Senatorial Campaign Committee, Inc.* (*DSCC I*), 699 F.3d 848 (5th Cir. 2012). We withdrew that opinion and issued another, concluding instead that:

> [A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors, but the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations. Thus, once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value.

*Janvey v. Democratic Senatorial Campaign Committee, Inc.* (*DSCC II*), 712 F.3d 185, 190 (5th Cir. 2013). This holding invalidated the basis for the district court's denial of the motions to compel arbitration. As a result, we vacated the denial of the motion to compel and remanded once again for the district court to reconsider the motions in light of *DSCC II*. *Janvey v. Alguire* (*Alguire III*), 539 F. App'x 478, 480–81 (5th Cir. 2013).

The district court once again denied the motions to compel, resting its result on three major conclusions. First, the district court rejected the Receiver's argument that he can choose the Stanford entity on whose behalf he sues, instead requiring the Receiver to sue on behalf of the Company, which was party to the arbitration agreements. *Janvey v. Alguire* (Denial Order), No. 3:09-cv-724, ECF No. 1093, at 9–10 (N.D. Tex. July 30, 2014) (order denying motions to compel arbitration).

Second, the district court concluded that the Receiver had rejected the arbitration agreements and that such rejection was permissible. *Id.* at 16–25.

6

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

The district court, drawing from well-established bankruptcy law, determined that an equity receiver, like a bankruptcy trustee, has the power to assume or reject any executory contract.    The district court concluded that executory arbitration agreements are analyzed as separable from the contracts in which they are contained.    Turning to the arbitration agreements in this case, the district court rejected the defendants' argument that the Receiver had not rejected the agreements, noting that federal equity receivers have no obligation to affirmatively reject an executory contract.    The district court determined that the Receiver's rejection of the arbitration agreements was permissible, explaining that it would be "unjust and inequitable" to burden and deplete the receivership estate by requiring the Receiver to adopt the arbitration agreements.

Finally, the district court concluded in the alternative that arbitration of the Receiver's claims would conflict with the central purposes and objectives of the federal equity receivership statutory scheme, and therefore exercised its discretion to deny the motions to compel arbitration.  *Id.* at 26–49.  The district court noted that in the receivership statutes Congress had "clearly emphasized the importance of consolidating in one court all matters involving the receivership estate and assets," that courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, and that the federal multidistrict litigation scheme implicated in this receivership also emphasizes consolidation before one court. *Id.* at 33–36. Drawing from case law involving conflicts between the purposes of the Bankruptcy Code and the Federal Arbitration Act (FAA), the district court concluded that

> a specific conflict arises between arbitrating the Receiver's fraudulent transfer claims under the Employee Defendants' arbitration agreements and certain central purposes of the federal

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

> equity receivership statutory framework, especially in the added
> context of the Stanford receivership being a multidistrict litigation
> SEC receivership over a Ponzi scheme.

*Id.* at 41. Considering that "[a]rbitration decentralizes, deconsolidates, strips the court and the receiver of exclusive jurisdiction over the receivership assets, interferes with the broad powers of both the court and the receiver to adjudicate all issues affecting receivership assets," *id.* at 46, and interferes with equal distribution of assets, the district court exercised its discretion to deny the motions to compel arbitration. *Id.* at 47–49.

In separate orders, the district court denied motions to compel arbitration filed by Juan Rincon (the former Executive Vice President and Chief Financial Officer of the Company),[4] Luis Giusti (a former member of the Bank's advisory board),[5] and Oreste Tonarelli (a former managing director of the Company's Private Clients Group).[6] The defendants appeal and their appeals were consolidated.

## II.

We have jurisdiction to consider this appeal even though the district court's denials of the motions to compel arbitration are interlocutory orders. *In re Mirant Corp.*, 613 F.3d 584, 588 (5th Cir. 2010). We review the denial of a motion to compel arbitration *de novo*, but we review the district court's factual findings for clear error. *Id.*

---

[4] *Janvey v. Rincon*, No. 3:11-cv-1659, ECF No. 44 (N.D. Tex. Aug. 29, 2014) (order denying motion to compel arbitration). The district court concluded that Rincon had waived his right to arbitration and, in the alternative, concluded that his motion would fail for the same reasons expressed in the Denial Order.

[5] *Janvey v. Giusti*, No. 3:11-cv-292, ECF No. 116 (N.D. Tex. Sept. 23, 2014) (order denying motion to compel arbitration). The district court denied the motion on the grounds expressed in the Denial Order.

[6] *Janvey v. Tonarelli*, No. 3:10-cv-1955, ECF No. 43 (N.D. Tex. Aug. 1, 2014) (order denying motion to dismiss or, in the alternative, to compel arbitration). The district court again denied the motion on the grounds expressed in the Denial Order.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworks of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). As a result, we analyze whether a party can be compelled to arbitrate using a two-step process. "First, we ask if the party has agreed to arbitrate the dispute." *Sherer v. Green Tree Serv. L.L.C.*, 548 F.3d 379, 381 (5th Cir. 2008). "While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). If the party opposing arbitration has agreed to arbitrate, "we then ask if 'any federal statute or policy renders the claims nonarbitrable.'" *Sherer*, 548 F.3d at 381 (quoting *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 598 (5th Cir. 2007)).

## III.

The Receiver argues that he is bringing his claims on behalf of the Bank, which has not agreed to arbitrate with the defendants, except in the case of Giusti. In the alternative, the Receiver argues that the arbitration agreements on which the defendants' motions are based should be rejected as part of the fraudulent scheme, and that his equitable authority as Receiver empowers him to reject executory contracts, including the arbitration clauses. Finally, the Receiver argues there is "an inherent conflict between arbitration and the [federal receiver] statute's underlying purpose" such that federal law does not permit the court to compel arbitration. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987). The various defendants disagree and also

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

argue that the district court exceeded the scope of our mandate in *Alguire III* by allowing the Receiver to avoid arbitration.[7]

## A.

The Receiver first argues that he is free to bring his TUFTA claims on behalf of any of the Stanford entities and that, by bringing the claims on behalf of the Bank, which was not a signatory to the arbitration agreements (except for the agreement with Giusti), he is not bound by the arbitration agreements. The district court disagreed, reasoning that allowing the Receiver to pick the entity on whose behalf he brought the claims "would be inconsistent with [the district court's] previous rulings and inconsistent with equity."  Denial Order at 10.[8]

We have previously considered at great length the Receiver's representative role.  In *DSCC II* we concluded that the Receiver "has standing to assert the claims of [the Bank], and any other Stanford entity in receivership."  712 F.3d at 192.  We clarified, however, that "the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations."  *Id.* at 190.  Therefore, "once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the

---

[7] The various defendants have collectively filed ten initial briefs and six reply briefs, and there is substantial overlap in their arguments.  Except where otherwise noted, we refer to the defendants collectively without distinguishing between their arguments.

[8] The district court also observed that certain difficulties might arise if the Receiver brought actions on behalf of the Bank, because the Receiver would have to challenge two fraudulent transfers: first, the transfer of funds from the Bank to the Company and, second, the transfer from the Company to the employee-defendants.  The district court stated that although TUFTA permits claims against subsequent transferees, Tex. Bus. & Comm. Code § 24.009(b)(2), the Receiver would need to show that the first transfer was fraudulent and would have to do so while representing both sides of the transaction (the Bank and the Company).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

principal fraudulently diverted to third parties . . . ." *Id.* We based our decision in that case on the Seventh Circuit's holding in *Scholes* that corporations involved in a fraudulent scheme, although "[the defrauder's] robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties." *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995).

*Scholes*, like *DSCC II*, determined that a receiver has standing to sue on behalf of formerly captive corporations and that the corporations, once freed from the control of the scheme's perpetrator, are not barred from recovery by the defense of *in pari delicto*. *Id.* at 754–55; *DSCC II*, 712 F.3d at 191–92. Although these cases do not directly answer our question, their reasoning compels a single outcome. If the corporations retain identities distinct from Stanford himself, as "separate legal entities with rights and duties," it logically follows that they are distinct from one another. *Scholes*, 56 F.3d at 754. Now that Stanford no longer controls the Bank and the Company for the benefit of an integrated criminal scheme, the Bank and the Company are separate actors. The Receiver, appointed by the court to represent all of the Stanford entities, may bring his claim on behalf of whichever of the entities he chooses, provided that the entity has a claim against the defendant in question.

The Receiver has exercised his authority to bring claims on behalf of the Stanford entities individually and argues that he brings his claims against the employee-defendants on behalf of the Bank. The Bank collected deposits from investors. The Receiver alleges that Stanford diverted those deposits from the Bank into the Company and then arranged for the Company to pay the employee-defendants in furtherance of his illegal scheme. These allegations satisfy the requirements of TUFTA, which allows any creditor to reclaim fraudulently transferred assets from the initial transferee (here the Company) or "any subsequent transferee other than a good faith transferee who took for

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

value." Tex. Bus. & Comm. Code § 24.009. The Bank, which has a "right to payment or property," is a creditor under TUFTA. *Id.* § 24.002(3), (4). TUFTA thus allows the Receiver to bring a claim on behalf of the Bank against the defendants as "subsequent transferee[s]" of the fraudulent transfers.[9]

The Bank is not a signatory to any of the promissory notes apart from Giusti's, nor is it a member or associated person bound to arbitrate under FINRA's rules. Moreover, the references to "affiliates" in the arbitration agreements are insufficient to bind the Bank. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) ("'A corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement.' Unlike a corporation and its employees, corporate affiliates are generally created to separate the businesses, liabilities, and contracts of each. Thus, a contract with one corporation—including a contract to arbitrate disputes—is generally not a contract with any other corporate affiliates.") (citations omitted) (declining to allow affiliates referenced in arbitration agreement to compel arbitration in the absence of an "alter-ego exception"). Because the Receiver brings his claims on behalf of the Bank and the Bank has not consented to arbitration, the motions to compel arbitration fail.

The defendants' arguments to the contrary are unavailing. They argue that three different equitable doctrines bind the Bank as a third party to the arbitration agreements between the Company and the defendants: alter ego, estoppel, and third-party beneficiary. These doctrines permit a court to impose

---

[9] *Wiand v. Schneiderman*, 778 F.3d 917 (11th Cir. 2015), on which the defendants rely for the proposition that a receiver cannot avoid arbitration by asserting claims on behalf of non-signatory receivership entities, is distinguishable on this ground. *Wiand* held that where the non-signatory entities had "no relationship at all with [the defendant]," they had no standing to pursue standalone claims against the defendant so as to provide an avenue for vacating an arbitration award. *Id.* at 925. Here, in contrast, the Bank has standing under TUFTA to bring its claims directly against the defendants.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

a contract on a third party who is not a signatory to the contract. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356, 358–63 (5th Cir. 2003). These three doctrines sound in equity. We do not apply equitable principles rigidly, but rather circumspectly, because they are "grounded in fairness . . . . 'In all cases, the lynchpin . . . is equity, and the point of applying it to compel application of a contractual provision is to prevent a situation that would fly in the face of fairness.'" *Bahamas Sales Assoc., L.L.C. v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) (alterations and citation omitted). None of the three doctrines bind the Bank.

The doctrine of alter ego allows a court to pierce the corporate veil and impose on an owner the obligations of its subsidiary "when their conduct demonstrates a virtual abandonment of separateness." *Bridas*, 345 F.3d at 359 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d. Cir. 1995)). "Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration." *Id.* (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1461 (10th Cir. 1995)). In prior litigation, we have made clear that the blurring of corporate boundaries and the wrongful acts taken by Stanford no longer equitably affect the hostage corporations now that they are under the control of the Receiver. *See DSCC II*, 712 F.3d at 192. Just as Stanford's removal from the scene vitiated the defendants' defense of *in pari delicto*, so it vitiates their defense of alter ego.

The defendants advance two theories of equitable estoppel, both of which are inapplicable. The "intertwined claims" theory governs motions to compel arbitration when a signatory-plaintiff brings an action against a nonsignatory-defendant asserting claims dependent on a contract that includes an arbitration agreement that the defendant did not sign. *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527–28 (5th Cir. 2000). It does not govern

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

the present case, where a signatory-defendant seeks to compel arbitration with a nonsignatory-plaintiff. *Bridas*, 345 F.3d at 361. The "direct benefits" theory of equitable estoppel "prevents a nonsignatory from knowingly exploiting an agreement containing the arbitration clause." *Graves v. BP Am., Inc.*, 568 F.3d 221, 223 (5th Cir. 2009). That is, "a nonsignatory cannot sue under an agreement while at the same time avoiding its arbitration clause." *Id.* This theory is inapplicable here because the Receiver does not seek to enforce the various contracts containing the arbitration agreements; rather, he seeks to unwind them and reclaim the benefits fraudulently distributed to the defendants under the contracts.

Finally, the third-party beneficiary doctrine prevents the intended beneficiary of a contract from avoiding the terms of the contract. It does not apply when a person merely is directly affected by the parties' conduct or has a substantial interest in a contract's enforcement. *Bridas*, 345 F.3d at 362. Rather, "[p]arties are presumed to be contracting for themselves only," and a third party is bound only "if the intent to make someone a third-party beneficiary is 'clearly written or evidenced in the contract.'" *Id.* (citing *Fleetwood Ent., Inc. v. Gaskamp*, 280 F.3d 1069, 1075–76 (5th Cir. 2002)). There is no indication in the contracts or promissory notes that the Company and the defendants intended the Bank to be the beneficiary of their agreements. The defendants argue that the inflated commissions paid to them under the contracts benefited the Bank because they induced more creditors to invest in the Bank, but this argument conflates Stanford with his victim corporations. Expanding the number of defrauded investors in the Bank merely expanded the Bank's ultimate liabilities and increased the injury to the Bank; it did not benefit the Bank as a corporate entity distinct from the fraudster, Stanford. *See Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)

14

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

("It takes cheek to contend that in exchange for the payments [an investor and promoter] received, the RDI Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments.").

Because the Receiver may sue on behalf of any of the Stanford entities that has a claim against the defendants, because he has chosen to sue on behalf of the Bank, which has not consented to arbitrate claims against any of the defendants, except Giusti, and because none of the equitable doctrines urged by the defendants applies, the Receiver cannot be compelled to arbitrate his claims against these defendants.

We also conclude, though on different grounds, that the Receiver cannot be compelled to arbitrate its claims against Giusti, who did enter into an agreement to arbitrate with the Bank.[10]  A party who has entered into an agreement to arbitrate must insist on this right, lest it be waived. "Under this circuit's precedent, a party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party." *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 421 (5th Cir. 2014) (internal quotation marks omitted). While waiver should not be inferred lightly, we conclude that Giusti's conduct in this case clears the waiver threshold.  After the Receiver sued Giusti in 2011, Giusti participated in discovery and other pre-trial litigation.[11]  Giusti ultimately moved to compel arbitration in 2014, and continued to litigate while that motion was pending.

_____

[10] Though the district court did not resolve Giusti's motion to arbitrate on these grounds, we may affirm the district court on any ground "presented by the parties," even if not "relied on by the [district] court." *See Resolution Performance Prod., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union, Local 4-1201*, 480 F.3d 760, 767 n.20 (5th Cir. 2007); *Bickford v. Int'l Speedway Corp.*, 654 F.2d 1028, 1031 (5th Cir. 1981) (district court may be affirmed "on any grounds, regardless of whether those grounds were used by the district court").

[11] For instance, Giusti moved to dismiss, filed an initial answer and amended answer, sent written discovery, and answered discovery.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

*See In re Mirant Corp.*, 613 F.3d at 589–91 (holding that a party substantially invoked the judicial process by, *inter alia*, submitting three motions to dismiss before moving to compel arbitration). One of the primary justifications for enforcement of private dispute resolution is the avoidance of large litigation costs, including discovery. Parties cannot enjoy the benefits of federal discovery, and then, after doing so, seek to enforce a decision through private resolution. We therefore conclude that Giusti substantially invoked the judicial process.

We also conclude that Giusti's participation in the judicial process prejudiced the Bank. *In re Mirant Corp.*, 613 F.3d at 591 ("In addition to invocation of the judicial process, the party opposing arbitration must demonstrate prejudice before we will find a waiver of the right to arbitrate."). Prejudice, in this context, "refers to delay, expense, and damage to a party's legal position." *Id*. It is apparent on the face of the record before us that the Bank was prejudiced, both by delay and increased litigation expenses, as a result of Giusti's decision to litigate for nearly three years before moving to compel arbitration. Therefore, we conclude that Giusti has waived his right to arbitration, and so the Receiver cannot be compelled to arbitrate its claims against him.

Accordingly, we conclude that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.

## B.

The Receiver also argues that these particular arbitration agreements are additionally unenforceable because they were instruments of the fraud inasmuch as the privacy they provided facilitated the fraud and because the Stanford entities were coerced into accepting them by Stanford as part of his

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

Ponzi scheme.[12] As a result, the Receiver argues that, under the logic of *DSCC II*, the Company cannot be bound to them now that Stanford is removed from the scene unless the Receiver affirmatively assents to them, and that enforcement of the arbitration agreements would give effect to the very fraud the Receiver is charged with unwinding by diminishing his ability to return fraudulently transferred assets to the creditors. The Receiver makes a strong argument that if we hold that he is bound by the terms of the contracts involved in Stanford's Ponzi scheme, there would be no basis for recovering the funds that were fraudulently transferred to the scheme's net winners pursuant to their employment contracts. We need not reach this issue as we have already determined, on other grounds, that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.

Nor do we reach the Receiver's similar but broader policy argument that the underlying purpose of the federal equity receivership statutes is at odds with the FAA's mandate in favor of arbitration. In support of this alternative basis for denying the motions to compel arbitration, the district court raised important concerns about undermining Congress's goal of consolidating receivership claims before a single court. However, we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court. *Cf., e.g., DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471

---

[12] The defendants counter that the validity of the arbitration clause is a question for the arbitrator because "where parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003). However, the Receiver does not, at this stage, argue that the entirety of the contracts between the employee-defendants and the Company are void. Although he will undoubtedly argue that proposition as part of the litigation on the merits, at the moment he merely argues that arbitration provisions, standing on their own as severable provisions of the contract, are void. "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

(2015) (rejecting interpretation of law that "does not give 'due regard . . . to the
federal policy favoring arbitration'") (quoting *Volt Info. Scis., Inc. v. Bd. of
Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989)).[13]

## C.

Finally, we reject the arguments raised by some of the defendants that
the district court's order exceeded the scope of our mandate in *Alguire III*.  "We
review *de novo* a district court's application of the remand order, including
whether the law-of-the-case doctrine or mandate rule forecloses the district
court's actions on remand."  *United States v. Teel*, 691 F.3d 578, 583 (5th Cir.
2012) (citation omitted).

In *Alguire III*, we stated:

> On appeal, the parties have focused primarily on whether the
> Receiver has standing to sue on behalf of creditors and not on
> whether he is bound by the arbitration clauses if he sues, as he
> must, on behalf of the Stanford Entities.  The district court did not
> address this issue.  We therefore remand to allow the district court
> to consider that question in the first instance.

539 F. App'x at 480.  Whether the Receiver is bound by the arbitration clauses
if he sues on behalf of the Stanford entities (which includes the Bank) is
precisely the question argued by the Receiver and answered by the district
court, according to our instruction.  We see no violation of the mandate rule.

Nor has the Receiver waived his arguments raised for the first time in
the district court, because those arguments were made in response to our
mandate that the district court consider a new issue in the first instance.
Moreover, the reason for the remand in *Alguire III* was that *DSCC II* effected
an intervening change in the law governing the Receiver's standing to sue on

---

[13] Likewise, we do not reach the parties' various other arguments, such as whether
some of the defendants have waived their right to arbitration or whether Giusti's arbitration
clause is unreasonable, as these issues are moot in light of our holdings here.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

behalf of non-receivership entities.  Before *DSCC II*, there was no need for the
Receiver to raise his current arguments as to why, when suing on behalf of the
receivership entities, he is not bound by the arbitration agreements.  Under
these circumstances, the Receiver properly raised new arguments to address
the new question before the district court.[14]

## IV.

Because the Receiver properly brings his TUFTA claims on behalf of the
Stanford International Bank, which did not consent to arbitration with any of
the defendant employees, other than Giusti, it cannot be compelled to arbitrate
with those defendants.   Moreover, because Giusti waived his right to
arbitration, the Receiver cannot be compelled to arbitrate its claims against
him either.   Accordingly, we AFFIRM the district court's denial of the
defendants' motions to compel arbitration.

---

[14] We also agree with the district court that the Receiver is not estopped from
contesting the arbitrability of his claims against defendants Charles Rawl and Mark Tidwell.
As the district court noted, although Stanford Group Company initiated arbitration
proceedings against Rawl and Tidwell, that arbitration occurred before the appointment of
the Receiver and involved claims and issues wholly distinct from those in the instant case.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I concur in the majority opinion but write separately to state what is, to these eyes, a more fundamental reason that the arbitration clauses in this case are not enforceable. Simply put, arbitration agreements may be rejected when they are instruments of a criminal enterprise, as these arbitration agreements were. The Federal Arbitration Act ("FAA") evinces Congress's desire to enforce arbitration agreements,[1] an expression warmly embraced by the judiciary. But, there are limits. Those limits here control.

I write against an informing backdrop of a decision of the Court of Exchequer nearly 300 years ago. In the 1725 case of *Everet v. Williams*, also known as the *Highwayman's Case*,[2] highwaymen Everet and Williams entered into a partnership to share robbery proceeds. They took their dispute over the proper division of their booty to court, filing a Bill in Equity at the Court of Exchequer. The court considered the Bill to be "scandalous and impertinent."[3] Both Everet and Williams were arrested and hanged. Counsel were punished with costs and one was sentenced to hang, but was ultimately banished.[4] The present case concerns the proper division of illegally procured booty from victims of a criminal enterprise—over $200 million, payable but frozen in accounts of sales persons of the enterprise, some having earned in excess of $2 million for their role in the scheme. In short, we have in judicial control over $200 million in booty, undisputed to be proceeds from the criminal scheme.

---

[1] *See Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2308–09 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344–46 (2011).

[2] 9 L.Q. Rev. 197 (1893).

[3] *U.S. S.E.C. v. Lyttle*, 538 F.3d 601, 605 (7th Cir. 2008).

[4] *See id.*; *Thomas v. UBS AG*, 706 F.3d 846, 851 (7th Cir. 2013).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

This case is only one of many attempting to sift the ruins of Allen Stanford's massive Ponzi scheme,[5] a simply constructed vintage fraud. "[A] Ponzi scheme is one where the 'swindler uses money from later victims to pay earlier victims.'"[6] Its name derives from Charles Ponzi, whose fraud the Supreme Court described almost a century ago:

> In December, 1919, with a capital of $150, [Charles Ponzi] began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him . . . Within eight months he took in $9,582,000, for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent. promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent, and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.[7]

At its core, a Ponzi scheme must have in its operation the ability to lull an investor by assuring payments from money of later investors, as there are few if any funds being generated by management of their investments. Its

---

[5] *See United States v. Stanford*, 805 F.3d 557, 564 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 491 (2016); *Zelaya v. United States*, 781 F.3d 1315, 1318 (11th Cir. 2015) (describing Stanford's scheme as "one of the largest Ponzi schemes in American history").

[6] *Stanford*, 805 F.3d at 564 n.1 (quoting *United States v. Murray*, 648 F.3d 251, 256 (5th Cir. 2011)).

[7] *Cunningham v. Brown*, 265 U.S. 1, 7–8 (1924). Ponzi was apparently not the first to come up with such a scheme. *See* CHARLES DICKENS, THE LIFE AND ADVENTURES OF MARTIN CHUZZLEWIT (1844).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

essence is to present an air of legitimacy, while simultaneously masking the source of the "return on investment," a reality that must not be exposed—to borrow from Gertrude Stein, that "there is no there there."[8] To this end, arbitration is a valuable tool. Arbitration helps ensure that the occasional dispute with an investor or employee remains private.

Arbitration as we presently know it was built on a bedrock interest of autonomy and its correlative, privacy. That interest has persisted.[9] The Supreme Court has accepted privacy as an expectation, if not an essential, of arbitration,[10] as has this Court.[11] In *Stolt-Nielsen S.A. v. AnimalFeeds International Corporation*, for example, the Supreme Court considered "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the [FAA]."[12] In finding that class arbitration in such instances was inconsistent with the FAA,[13] Justice Alito described some "fundamental changes" between bilateral and class-action arbitration.[14] Notably, citing the Amicus Brief for the American Arbitration Association, Justice Alito explained, "[u]nder the Class Rules, 'the presumption of privacy and confidentiality' that applies in many bilateral arbitrations 'shall not apply in class arbitrations,' thus potentially frustrating the parties' assumptions when they agreed to arbitrate."[15] One year later in *AT&T Mobility*, Justice Scalia echoed the observation of arbitration's confidential

---

[8] EVERYBODY'S AUTOBIOGRAPHY (1937).

[9] *See* Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L.J. 2804, 2894–95 (2015).

[10] *See AT&T Mobility*, 563 U.S. at 348.

[11] *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 175 (5th Cir. 2004) ("[T]he plaintiffs' attack on the confidentiality provision is, in part, an attack on the character of arbitration itself.").

[12] 559 U.S. 662, 666 (2010).

[13] *See id.* at 684.

[14] *Id.* at 686.

[15] *Id.* (citation omitted).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

nature. In concluding that class arbitration was inconsistent with the FAA, Justice Scalia pointed out differences between bilateral arbitration and class-action arbitration.[16] For one, "[c]onfidentiality becomes more difficult."[17] Such sentiments not only acknowledge confidentiality as a bargained-for virtue of arbitration, but also bring a judicial view that it is to be protected.

One thus understands why the operator of a Ponzi scheme would be attracted to arbitration. A single lawsuit—even one unrelated to the scheme—may, by the discovery process of a state or federal court, expose the source of an "investor's return"—the fraud. Swindlers can use arbitration to mitigate discovery and cabin attending risk of exposing fraudulent activity while presenting arbitration, not as a tool of fraud, but as business as usual. In short, arbitration can assume a not insignificant role in protecting defendants' privacy,[18] as we will see it did here.

"Stanford created and owned a network of entities . . . that sold certificates of deposit ("CDs") to investors through the Stanford International Bank, Ltd."[19] "When the scheme collapsed in early 2009, the Stanford entities had raised over $7 billion from sales of fraudulent CDs."[20] At the SEC's request, the court appointed Ralph Janvey "as receiver over Stanford, his associates, his corporations, and their assets."[21] The Receiver, standing in the shoes of the Stanford entities,[22] sued the employees, e.g., brokers, of the various Stanford entities to recover assets like salaries and bonuses earned

---

[16] *AT&T Mobility*, 563 U.S. at 347–48.

[17] *Id.* at 348.

[18] *See generally* Resnik, *supra* note 9, at 2894–96 (discussing real and perceived privacy in arbitration).

[19] *Janvey v. Brown*, 767 F.3d 430, 433 (5th Cir. 2014) (citation omitted).

[20] *Id.* (citation omitted).

[21] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 189 (5th Cir. 2013) [hereinafter *DSCC II*].

[22] *Janvey v. Alguire*, 539 F. App'x 478, 480 (5th Cir. 2013) (unpublished).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

from the scheme. Those employee-defendants object, claiming that the Receiver is required to arbitrate. Simply stated, the employee-defendants, Appellants here, had contracts containing arbitration clauses with Stanford entities. The employee-defendants argue that, since the Receiver stands in the shoes of the Stanford entities, he is bound to arbitrate as per their contracts with those entities. The Receiver disagrees, mounting a variety of attacks, including that "[t]he agreements were part of the fraud and coerced by the principals," and "[h]olding that the Entities remain bound to these agreements when represented by the Receiver is illogical and fundamentally at odds with the holding of *DSCC II*." I agree.

The general principles of arbitration are easily stated, more so than applied. That an arbitration clause be treated as a contract distinct from the contract in which it appears is essential to forcing resolution of a dispute to arbitration.[23] Said differently, arbitration clauses are severable from the contracts they are contained within, and any resistance to arbitration must target the arbitration clause itself.[24] As the Court embraced arbitration, *Prima Paint* followed as night from day, holding that a claim of fraud in the inducement and fraud on the contract do not vitiate the independent arbitration clause.[25] Indeed, mine-run assertions of fraud and failed performance of contractual promises will seldom touch the arbitration clause, and the full case will proceed to arbitration. But *Prima Paint* also drew a line: although "claims of fraud in the inducement of the contract generally" must be

---

[23] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.").

[24] *Id*. at 445–46; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010).

[25] *See Prima Paint Corp.*, 388 U.S. at 404.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

arbitrated, claims of "fraud in the inducement of the arbitration clause itself"
may be litigated.[26] In my opinion, the latter category encompasses an
arbitration agreement used as an instrument of a criminal enterprise.

While the Supreme Court continues to staunchly enforce arbitration to
resolve disputes arising from contracts with arbitration clauses, it has not
faded the *Prima Paint* boundary. The Supreme Court has long enforced
agreements to arbitrate statutory claims,[27] including claims under § 10(b) of
the Securities Exchange Act of 1934 and claims under the Racketeer
Influenced and Corrupt Organizations Act (RICO).[28] And, citing § 2 of the
FAA,[29] it has reaffirmed that the FAA's "saving clause permits agreements to
arbitrate to be invalidated by 'generally applicable contract defenses, such as
fraud, duress, or unconscionability,'" but, it has noted, "not by defenses that
apply only to arbitration or that derive their meaning from the fact that an
agreement to arbitrate is at issue."[30] In *American Express Co. v. Italian Colors*

---

[26] *Id.* at 403–04; *accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473
U.S. 614, 627 (1985) ("[C]ourts should remain attuned to well-supported claims that the
agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that
would provide grounds 'for the revocation of any contract.'" (citations omitted)).

[27] *See Mitsubishi Motors Corp.*, 473 U.S. at 626–27.

[28] *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 222, 238, 242 (1987).

[29] *AT&T Mobility*, 563 U.S. at 339 ("'A written provision in any maritime transaction
or a contract evidencing a transaction involving commerce to settle by arbitration a
controversy thereafter arising out of such contract or transaction ... shall be valid,
irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the
revocation of any contract.'" (quoting 9 U.S.C. § 2)).

[30] *Id.* at 339–40 (citations omitted). That arbitration agreements are instruments of a
fraudulent scheme is not an arbitration-specific defense. Any contract employed as an
instrument of a fraudulent scheme would similarly be invalid. In any event, the cases cited
by the Court evidence its concern for state laws targeting arbitration clauses. *E.g., Doctor's
Associates, Inc. v. Casarotto*, 517 U.S. 681, 683 (1996) (holding "that Montana's first-page
notice requirement, which governs not 'any contract,' but specifically and solely contracts
'subject to arbitration,' conflicts with the FAA and is therefore displaced by the federal
measure.").

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

*Restaurant*,[31] the Supreme Court enforced a waiver of class arbitration against merchants suing American Express for a Sherman Act violation,[32] even though the cost of proving such a claim would far exceed the potential recovery for any individual plaintiff.[33] The Court found that "[n]o contrary congressional command,"—the antitrust laws or Rule 23—required it "to reject the waiver of class arbitration."[34] It also considered and rejected the "effective vindication" exception to the FAA.[35] "[T]he exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies,'"[36] the Court reasoned, "[b]ut the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy."[37] These cases demonstrate the Court's firm defense of arbitration, but do not suggest that when arbitration has been used as an instrument in fraud itself, arbitration should nevertheless be enforced.[38]

---

[31] 133 S. Ct. 2304 (2013).

[32] *Id.* at 2308 ("According to respondents, American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards. This tying arrangement, respondents said, violated § 1 of the Sherman Act." (footnote omitted)).

[33] *Id.* at 2316 (Kagan, J., dissenting) ("Italian Colors could take home up to $38,549. But a problem looms. As this case comes to us, the evidence shows that Italian Colors cannot prevail in arbitration without an economic analysis defining the relevant markets, establishing Amex's monopoly power, showing anticompetitive effects, and measuring damages. And that expert report would cost between several hundred thousand and one million dollars." (footnote omitted)).

[34] *Id.* at 2309 (majority opinion).

[35] *Id.* at 2310 ("The 'effective vindication' exception to which respondents allude originated as dictum in *Mitsubishi Motors*, where we expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] ... as a prospective waiver of a party's right to pursue statutory remedies.'" (citation omitted)).

[36] *Id.* (citation omitted).

[37] *Id.* at 2311 (citation omitted).

[38] *Id.* at 2312 (2013) (Thomas, J., concurring) ("[T]he FAA requires that an agreement to arbitrate be enforced unless a party successfully challenges the formation of the arbitration agreement, such as by proving fraud or duress." (citation and quotation marks omitted)).

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

I am persuaded that the Receiver—standing in the shoes of the Stanford entities—is not bound by the arbitration agreements because those agreements were instruments of Stanford's fraud. Stanford and his co-conspirators exercised complete control over the receivership entities before the scheme collapsed,[39] and that control included the agreements to arbitrate, which were part of the contracts that had to be signed by the entities.[40] The arbitration agreements were central to the Stanford Ponzi scheme with its inherent need for privacy. As part of their employment contracts, the brokers fed the enterprise by the ongoing sale of CDs, for which they were handsomely compensated. Perversely, some employee-defendants claim they were deceived by the Ponzi scheme, yet the privacy of arbitration helped keep it hidden. The arbitration clauses, including their ostensible compliance with FINRA rules, perpetuated the Ponzi scheme by shielding the fraudulent activity from potentially revealing discovery while giving the scheme an air of legitimacy.[41] It signifies that a Ponzi scheme is extrinsic to the enforcement of promises of contracts that only in aggregation become illegal. This case does not present single inducement claims upon distinct contracts, rather it presents the claims

---

[39] *See Brown*, 767 F.3d at 437–39; *DSCC II*, 712 F.3d at 193 ("Because the Stanford corporations were the robotic tools of Stanford's Ponzi scheme, knowledge of the fraud could not be imputed to them while they were under Stanford's coercion."); *id.* at 198 (concluding "that the evidence presented to the district court overwhelmingly established that, from at least as early as 1999, the Stanford corporations were nothing more than robotic tools of Stanford's elaborate Ponzi scheme").

[40] Because this Court has embraced the principles in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), *see Brown*, 767 F.3d at 437; *DSCC II*, 712 F.3d at 190–92, the receivership entities are not responsible for actions directed by Allen Stanford to perpetuate the fraudulent Ponzi scheme.

[41] Granted, there are exceptions to the general privacy afforded in arbitration. *See* Resnik, *supra* note 9, at 2896–97. For instance, FINRA rules require arbitration awards to be publicly available. FINRA Rules 12904(h), 13904(h). Nevertheless, the basic disputes remain concealed.

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

of many swept into the vortex of a criminal enterprise collectively providing its fuel of new investors.

One lesson of the *Highwayman's Case* is that efforts to enforce contracts in service of criminal enterprise ought receive a cold reception in the courts. Surely we would not enforce an arbitration clause in the agreement between Everet and Williams. Their autonomous right to dial out of the sovereign's courts to frustrate its criminal law ought be no more enforceable than the court's direct enforcement of their agreements to share the booty—at the least when its felonious nature has been established by conviction of the architect of the criminal scheme.

It is oft-repeated that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements."[42] Since then, dispelling any notion of lingering hostility, courts have steadily increased their defense of arbitration, posing the question of its limits. I offer no new limit and break no new legal ground. There are outer boundaries to the enforcement of arbitration agreements, and they surely hit shoal water as they encounter the criminal enterprise, the existence of which here has been judicially determined and for which its principals have been convicted and sent to prison.[43]

Privacy remains a significant attractant to arbitration even as the cost of arbitration approaches that of litigation. In a Ponzi scheme, covering the eyes and ears of lulled investors by using arbitration, with its obstruction of the powerful discovery process of federal courts, mitigates the risks of a torch in a hay barn where a hot ember can take it down. It is no accident that even promissory notes with the sales personnel contained arbitration provisions. Here, the risk of discovery is so high as to pull the arbitration clause to the

---

[42] *AT&T Mobility*, 563 U.S. at 339; *accord Am. Express Co.*, 133 S. Ct. at 2308–09.
[43] *Stanford*, 805 F.3d at 563; *DSCC II*, 712 F.3d at 189.

28

No. 14-10857
Cons. w/Nos. 14-10945, 14-11014, 14-11093

heart of the criminal enterprise and from the bite of *Prima Paint*. This is not to gainsay the strong support of arbitration by the Congress and the courts. Rather, refusing to enforce arbitration provisions deployed in service of an illegal scheme travels with and reinforces this foundational support—a friend, not an enemy, of arbitration.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

March 16, 2017

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

     No. 14-10857 **cons/w** 14-10945, 14-11014, and 14-11093
                 Ralph Janvey v. James Alguire, et al
                 USDC No. 3:09-CV-724
                 USDC No. 3:10-CV-1955
                 USDC No. 3:11-CV-1659
                 USDC No. 3:11-CV-292

Dear Ms. Mitchell,

Enclosed are copies of the judgments issued as the mandate and a
copy of the court's opinion.

                 Sincerely,

                 LYLE W. CAYCE, Clerk

                 By: _____
                 Nancy F. Dolly, Deputy Clerk
                 504-310-7683

cc:  Mr. Paul Gerard Alvarez
     Mr. Mark Joseph Barrera
     Mr. Kim Bernard Battaglini
     Mr. Monroe David Bryant Jr.
     Ms. Stephanie Frederique Cagniart
     Mr. Bradley Wayne Foster
     Mr. Jason Wayne Graham
     Mr. John J. Little
     Mr. Matthew Griffith Nielsen
     Mr. Michael L. O'Brien
     Mr. John C. Porter Jr.
     Mr. Scott Daniel Powers
     Ms. Carolyn Ruth Raines
     Mr. Dennis L. Roossien Jr.
     Mr. Kevin M. Sadler
     Mr. Brian N. Smiley
     Mr. Edward C. Snyder

Mr. Michael John Stanley
Mr. Theodore Brandon Welch
Mr. Walter Perry Zivley Jr.